UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
Northern Division

**SELENA BARBER**
5511 CEDELLA AVENUE
BALTIMORE, MD 21206
[Baltimore City, MD]

and

**A.G., a Minor,** by and through her Parent
and Next Friend, **SELENA BARBER**
5511 CEDELLA AVENUE
BALTIMORE, MD 21206
[Baltimore City, MD]

*Plaintiffs*

v.

**BALTIMORE LUTHERAN HIGH
SCHOOL ASSOCIATION, D/B/A
CONCORDIA PREPARATORY SCHOOL**
1145 CONCORDIA DRIVE
TOWSON, MD 21286
[Baltimore County, MD]

SERVE ON RESIDENT AGENT:
BRENT JOHNSON
521 IDLEWILD ROAD
BEL AIR, MD 21014

*Defendant.*

Case No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT AND JURY DEMAND

    **NOW COME** the Plaintiffs, A.G., a minor, by and through her mother and next friend,

Selena Barber, and by and through her attorneys, Ketterer, Browne & Anderson, LLC, and

brings forth this Complaint against the Defendant, Baltimore Lutheran High School Association

d/b/a Concordia Preparatory School and in support sets forth the following:

1

## PARTIES, JURISDICTION, AND VENUE

1.      At all times relevant to this action, Plaintiff A.G. is a minor resident of Baltimore City County, Maryland (hereinafter referred to as "A.G.").

2.      At all times relevant to this action, Plaintiff Selena Barber is an adult resident of Baltimore City County, Maryland, and is the mother of the minor Plaintiff A.G.

3.      Plaintiffs A.G. and Selena Barber will be referred to collectively as "Plaintiffs".

4.      At all times relevant to this action, Defendant Baltimore Lutheran High School Association d/b/a Concordia Preparatory School (hereinafter referred to as "CPS") is a corporation organized and existing under the laws of the State of Maryland that maintains its principal place of business at 1145 Concordia Drive, Towson, Maryland.

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because Plaintiff's statutory claim asserts a federal question over which this Court has jurisdiction and Plaintiffs asserts state-law claims over which this Court has supplemental jurisdiction.

6.      This Court has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k)(1)(a) because Defendant CPS is domiciled in and conducts business within this judicial district.

7.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because all the acts and omissions alleged herein occurred in this judicial district.

8.      The Northern District is the proper venue per 28 U.S.C. § 100(1).

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

9.      A.G. enrolled at CPS as a sixth grade student in the winter of 2016, when she was just 11 years old.

10. CPS is an elite, co-educational parochial secondary school serving grades 6-12.

11. Originally known as Baltimore Lutheran School, CPS is operated by the Baltimore Lutheran High School Association, Inc., an organization of Lutheran churches in the Baltimore area.

12. Like most Lutheran schools and churches, CPS is overseen by the Lutheran Church–Missouri Synod, the governing body of the Lutheran church.

13. The Synod is divided into 35 districts, each with its own district president and staff of coordinators and overseers tasked with handling issues within member congregations and schools.

14. According to CPS's website, the estimated annual cost of attendance for a high school enrollee is over $15,000.

15. Although A.G. had a variety of options for her middle school education, she and her family chose CPS due to CPS representatives' promises of a safe, tight-knit community.

16. CPS representatives told A.G. and her mother that the school offered a caring, closely-knit community in which she would have teachers and administrators looking out for her safety and well-being.

17. A.G. and her mother believed she would be safe and would thrive at CPS as she had previously in elementary school.

**CPS'S HYPER-SEXUALIZED CULTURE**

18. A.G. found CPS to be far from the safe, caring community that she was promised.

19. At various times during her tenure at CPS, A.G. experienced unwelcome sexual advances from some male students who were emboldened by formal and informal "traditions" and condoned practices at the school.

3

20.     The concept of CPS students engaging in sexual behavior on CPS property, often during the school day, has long been part of CPS's ethos.

21.     Upon information and belief, one of the frequent venues for sexual behavior on CPS's campus is the visiting sports team's locker room (hereinafter the "Locker Room"), and other co-ed and handicapped bathrooms.

22.     Students would routinely engage in sexual acts, ranging from "making out" to having intercourse, throughout the CPS campus, including empty classrooms, bathrooms, on the athletic fields and in the hallways of the school.

23.     The culture of using the Locker Room, the bathrooms, and other locations on the CPS campus as venues for engaging in sexual behavior during the school day was a prevalent part of CPS's culture while A.G. was a student, and was well known to the faculty and administrators.

24.     Students, parents, and concerned CPS teachers brought their knowledge of school locker rooms and bathrooms being popular venues for sexual behavior to the CPS administration, but nothing was done to address the problem.

25.     This hyper-sexualized culture at CPS was fueled in large part by a general consensus that student-athletes – especially male student-athletes, whose athletic programs drew in large alumni donations – were "above the law" and free from recrimination for rule-breaking.

26.     For example, male student-athletes were routinely and categorically exempted or excused from detentions, suspensions, and other disciplinary measures when they conflicted with sports practices and games or would otherwise jeopardize the reputation of a CPS sports program.

27.     As another pertinent example, male student-athletes routinely got away with sexual assault and harassment as CPS consciously ignored incidents or downplayed their seriousness.

## CPS'S FAILURE TO PREVENT AND PROTECT AGAINST SEXUAL HARASSMENT AND ASSAULT ON ITS CAMPUS

28.     CPS failed to investigate, report, or take any meaningful action to curb instances of sexual harassment and assault on its campus prior to, during, and after A.G.'s enrollment.

29.     Upon information and belief, other former CPS students, who are still minors, were the victims of sexual assault during their tenure at CPS for which no investigation took place.

30.     One such former student, N.H., a minor, filed a lawsuit against CPS in October 2020 for allegations concerning CPS' lack of proper investigation into sexual assaults that took place on CPS grounds in and around 2018 (Civil Action No. 1:20-cv-03132).

31.     This failure is not surprising given CPS' pattern of ignoring sexual assault and harassment.

32.     CPS was, or should have been, aware that many of its male students routinely used text messaging and social media applications such as SnapChat, often during the school day and while using CPS' internet and email servers to harass female students and request sexual favors to be performed on the CPS campus.

33.     CPS was, or should have been, aware that many of its male students (some of them over the age of 18) used the CPS campus as a venue for forced sexual encounters with female students.

34.     CPS was, or should have been, aware of at least two videos involving then-CPS students, who were minors at the time, that contained and/or depicted those students involved in

sexual acts. The CPS administration chose not to report these videos, which they themselves suspected to be child pornography, to local law enforcement so as to avoid being part of any investigation.

35.     CPS knew or should have known that students used the Locker Room, bathrooms, and other locations on the CPS campus as venues for sexual harassment and/or statutory rape and secured CPS facilities that students used as "hook-up" spots or venues for sexual behavior.

36.     CPS took no significant action to investigate this allegation or any other instances of alleged aggressive sexual behavior by its male students.

37.     CPS took no significant action to prevent high school students from comingling with middle school students during the school day and on the CPS campus. This comingling often lead to unwanted sexual contact, harassment, and sexual assault perpetrated by the high school students at the expense of the middle school students.

38.     In one instance in which CPS failed to respond to a middle school parent's reports that a high school junior was repeatedly sexually harassing and soliciting her daughter via text message and SnapChat, the middle school student was later sexually assaulted by the junior student; charges are pending against that individual for attempted rape.

39.     Similarly, CPS failed to investigate the usage of the Locker Room, bathrooms, and other locations on the CPS campus as venues for sexual encounters, despite readily available means that would have made it possible for CPS to determine which male students were luring female students into the Locker Room for sexual encounters.

40.     Had CPS conducted the careful investigation that was plainly warranted and taken appropriate action, these known instances of sexual assault could have been easily prevented.

41.    CPS' failure to act resulted in, among other harms, A.G.'s sexual assaults and/or harassment as described herein.

**CPS FOLLOWS OUTDATED AND REJECTED INVESTIGATIVE PRACTICES TO THE DETRIMENT OF ITS FEMALE STUDENTS**

42.    Upon receiving a report of sexual harassment, sexual assault, or cyberbullying from one of its students, CPS administrators employed outdated, universally rejected investigative tactics in the instances where an investigation actually took place in response to a survivor's reports.

43.    Those outdated investigative tactics include CPS's practice of requiring that the perpetrator of assault, harassment or bullying admit to their wrongdoing, and/or that an independent third party witnessed the alleged conduct, in order for a thorough investigation and disciplinary action to occur.

44.    Without an admittance of guilt or a third party witness, CPS's practice in response to sexual harassment and sexual assault allegations is to decline taking any disciplinary action against the perpetrator beyond a mere verbal warning.

45.    CPS administrators do not inform students or parents of this practice, instead leading female students who allege sexual misconduct to believe that their allegations are being investigated thoroughly and appropriately.

46.    CPS continues to abide by this artificially high standard and will not impose discipline in "he said/she said" scenarios, no matter how credible the survivor might be or how many prior reports exist concerning the perpetrator of which the administration was aware.

47.    CPS administrators would often arbitrarily group reports of bullying and sexual misconduct against a perpetrator together so as to issue discipline as if the perpetrator had violated CPS policy for the very first time.

48.     This practice of arbitrarily grouping incidents of policy violations together in order to treat repeated patterns of misconduct as a first-time offense was almost exclusively done in situations involving male student-athletes.

49.     Despite the fact that CPS's policies concerning sexual assault, sexual harassment, and bullying call for increasingly serious disciplinary measures in cases of repeat offenses, CPS's practice of treating repeat offenses as though they were the first offense effectively undercut their own policies and procedures and sent a message to male students that these policies were meaningless.

50.     On several occasions, CPS administrators would allow a perpetrator of sexual assault or egregious sexual cyberbullying to voluntarily withdraw from CPS in lieu of being expelled. The voluntary withdrawal would allow the perpetrator to enroll at another school without record of their disciplinary issues posing a problem with admissions. Essentially, CPS's practice of allowing voluntary withdrawals allowed perpetrators of sexual misconduct to attend schools and colleges without their new schools being made aware of the allegations against them – putting other communities at risk.

## CPS CIRCLES THE WAGONS

51.     Upon information and belief, a female CPS psychologist hired in or around 2017 abruptly left her position with CPS after repeated clashes with CPS Headmaster Brent Johnson, who refused to allow the psychologist to implement mandatory reporting policies for sexual assault cases.

52.     In or around that same year, a group of CPS teachers reported their concerns relating to CPS's treatment of sexual assault and harassment on campus to the CPS school board.

53.     As a result of one of these meetings, Ron Jasion, a member of the Board of Directors, called for an investigative committee to probe the allegations brought to him by the teachers.

54.     In response, Brent Johnson claimed that the teachers' allegations were unfounded and reflected one mother's individual vendetta against Brent Johnson on behalf of her daughter, a former student at CPS.

55.     Brent Johnson withheld and mischaracterized his knowledge that over two dozen female students at CPS had been sexually harassed, sexually assaulted, or cyberbullied from 2016-2021, often more than once.

56.     To date, no investigative committee has been formed to address these concerns.

57.     Concurrently, this group of teachers raised their concerns about the hyper-sexualized culture at CPS to administrators during monthly "all-faculty meetings", where their concerns were dismissed.

58.     Of note regarding these "all-faculty meetings" is that Ms. Grill, a CPS guidance counselor who upon information and belief routinely dissuaded female students from pursuing sexual assault allegations and who deterred the use of "assault" to describe their experiences, kept the minutes of those meetings along with the school's HR director.

59.     In the midst of this unrest between concerned faculty members and the CPS administration, and in an effort to silence the growing number of reports of assault that came forth from survivors of abuse at CPS during the 2018-2019 academic year, the Lutheran Church-Missouri Synod, Southeastern District (LCMS) dispatched a crisis management team to CPS.

60.    Among the LCMS employees sent to CPS to handle the mounting reports of sexual assault and harassment on campus was Sally Hiller, Executive Director for Congregational Outreach and District Operations for the Southeastern District of LCMS.

61.    Ms. Hiller met with faculty on more than one occasion during the 2018-2019 school year, not in an effort to understand and respond to their concerns, but instead to institute intimidating gag orders and quash the faculty's push for the administration to implement more stringent policies concerning sexual assault and harassment.

62.    Upon information and belief, several members of this cadre of concerned teachers left their jobs at CPS at the conclusion of the 2018-2019 school year in protest of the CPS administration's treatment of sexual assault and harassment issues throughout the school.

## A.G. IS REPEATEDLY HARASSED ON CPS' CAMPUS AND IS LATER ASSAULTED

63.    Mere days into her tenure at CPS, A.G. began to experience bullying perpetrated by "W", a seventh grade student.

64.    A.G. and "W" met during a "shadow day" prior to A.G.'s enrollment, and A.G. attempted to befriend this acquaintance as a new student at CPS. Her efforts were rebuffed by W and his clique, who began verbally harassing A.G. in the hallways, lunchroom, and in the band room.

65.    A.G. told her mother about the bullying, and her mother spoke to then-principal Ruth Heilman about her daughter's experience. No action was taken with respect to following CPS's bullying policy, including recording the reports on the CPS Bullying Form.

66.    The bullying persisted throughout the winter of 2016 and early spring of 2017, and included "W" using A.G.'s friends' social media accounts to contact A.G. (who had blocked

"W" from her social media accounts) and issue threats of physical and sexual violence against her.

67.    In April, A.G. and her mother took screenshots of these messages and emailed them to Curtis Miller, the middle school principal, and asked for a meeting with him to discuss the issue.

68.    Curtis Miller did not take any action to address or mitigate the threats and bullying that A.G. was experiencing.

69.    A week later, "W" and his friends followed A.G. from her locker after school to the quad area in between the middle and high school buildings, taunting her and making threats to harm her within earshot of Mrs. Edwards, Ms. Yu, and Mrs. Calhera.

70.    Once in the quad, several of the students, including "W", attempted to physically intimidate A.G. by throwing their backpacks on the ground and stepping into A.G.'s personal space, telling her that they were going to "beat her up".

71.    Some of the threatening language levied against A.G. was about her appearance, race, and body.

72.    A.G. became increasingly scared for her safety and so she fled the quad and ran to the main office in hopes of speaking with an administrator.

73.    "W" followed her to the office, calling after her and shouting that she was a snitch and that further harm would come to her if she told administration about their altercation in the quad.

74.    Meanwhile, A.G.'s mother was waiting in the parking lot for A.G. and became concerned when she did not make her way to the car.

75.     A.G.'s mother entered the upper school building and went to the main office to find out where A.G. was and why she wasn't answering her phone.

76.     A.G. voiced her concerns to her mother, Mrs. Grill and Mr. Miller about the bullying and intimidation she had just experienced in the quad.

77.     Mr. Miller assured A.G. and her mother that he would get to the bottom of the bullying.

78.     Mr. Miller did not take any steps to curb the bullying and threats that A.G. received from "W" and his friends, and the bullying continued into the following year.

79.     A.G. began to be increasingly frustrated that Mr. Miller did not handle her reports of bullying and felt that she had to stand up for herself in order to stay safe and deter future incidents of bullying.

80.     A.G. and her mother began to suspect that Mr. Miller viewed A.G. as a problem, and treated her as such in his interactions with A.G. and in his representations of A.G. to other faculty members.

81.     In the spring of 2017, A.G. was at the end of her 7th grade year when she began being bullied by "J", a track and basketball athlete. This bullying persisted for a year, well into A.G.'s 8th grade year at CPS.

82.     In or around March of 2018, "J" pushed A.G. after lunch. "J", who had a reputation amongst students for assaultive conduct and sexual harassment, kept his hands on A.G.'s body in an attempt to block her from moving beyond him in the hallway. In an attempt to stand up for herself, A.G. pushed "J" off her.

83.     Mrs. Cheryl Foley, A.G.'s science teacher, witnessed the interaction and grabbed A.G. by the jacket and reprimanded her.

84.    Both students were sent to the office and received punishment.

85.    "J" continued to target A.G. for the remainder of the school year and into the following fall, with no intervention on the part of CPS.

86.    On or around September 27, 2018, "J" assaulted A.G. on two occasions during the school day, forcibly striking her in the back and punching A.G. in her windpipe.

87.    A.G.'s mother brought the assaults – and her knowledge of "J's" prior history of assaultive conduct – to Curtis Miller's attention on September 30, 2018 via email.

88.    Curtis Miller never responded to A.G.'s mother's email.

89.    A.G. noticed a shift in how many of her teachers and the CPS administration began to treat her after A.G.'s mother reported the incidents with "J" to school officials.

90.    That same semester, A.G. began receiving infractions for policy violations with increasing frequency.

91.    For example, A.G. repeatedly received infractions for spending "too long" in the bathroom, despite the fact that CPS was on notice that A.G. experienced migraines and took prescription medicine that often necessitated trips to the bathroom.

92.    Similarly, A.G. was given infractions for cell phone use during the school day (a violation of CPS policy for middle schoolers) despite there being no evidence of her having used her phone, simply because she frequently used the bathroom and certain teachers assumed that she was using her bathroom breaks as a surreptitious attempt to use her cell phone.

93.    A.G. began to feel self-conscious and anxious about using the bathroom during the school day.

94.    As another example, when A.G. missed school one week due to illness and a death in the family, she was given infractions for absenteeism; Curtis Miller told A.G. that these

"excuses" were "pathetic" and threatened to call a truancy officer if A.G. continued to miss school.

95.     Curtis Miller later denied the conversation to A.G.'s mother.

96.     A.G., who had never been a troublemaker or rule breaker prior to this year, began receiving Saturday detentions every week for months on end.

97.     A.G. was then given lunch detentions almost every day.

98.     On February 14, 2019, A.G's mother wrote to Curtis Miller requesting that all future meetings between Mr. Miller and A.G. take place with A.G.'s mother present, as a result of the negative and harassing tone that Mr. Miller had begun taking towards A.G. in their one-on-one meetings.

99.     On February 21, 2019, A.G.'s mother wrote to Headmaster Brent Johnson asking to meet with him about Curtis Miller's retaliatory conduct towards A.G.

100.    That same day, A.G.'s mother wrote to Sally Hiller, Executive Director for Congregational Outreach and District Operations at the Lutheran Church-Missouri Synod, informing her of the ongoing issues with CPS and asking her to facilitate mediation between the parties.

101.    On March 14, 2019, A.G.'s mother met with Brent Johnson to discuss A.G.'s infractions and her interactions with Curtis Miller.

102.    A.G.'s mother followed up with a letter asking that the erroneous infractions be stricken from A.G.'s records.

103.    Curtis Miller continued to meet with A.G. privately and to make hostile comments towards her.

104.     On May 22, 2019, A.G.'s mother emailed Brent Johnson and Sally Hiller again to reiterate her request that Curtis Miller no longer hold private meetings with A.G. and shared her concerns that Curtis Miller was harassing, mistreating and demeaning A.G.

105.     Sally Hiller responded on behalf of herself and Brent Johnson, stating that A.G.'s mother's concerns had been addressed.

106.     A.G. and her mother decided to leave the CPS community at the conclusion of that school year due to the hostile environment and the rampant, unchecked harassment and bullying that A.G. experienced.

107.     A.G. disclosed her experiences with bullying and harassment to CPS administrators who failed to conduct a thorough investigation, failed to do anything to stop the ongoing bullying harassment, and failed to offer A.G. *any* accommodations based on the harassment and bullying she had reported.

108.     Upon information and belief, these issues continue to pervade the CPS campus. Indeed, older CPS students warned A.G. that the problems she experienced would only worsen once she entered the upper school.

### A.G. IS TREATED LIKE A PROBLEM, NOT A SURVIVOR

109.     After reporting her experiences with bullying and her assaults to CPS, it became apparent to A.G. and her mother that the administrators were skeptical of A.G.'s reports and sought only to protect their students, including "W" and "J" from any further gossip, speculation, and most of all, discipline.

110.     No disciplinary action was taken with respect to "W" or "J", except for the one incident where both A.G. and "J" were punished.

111.     No support or accommodations were ever offered to A.G. by CPS.

112.    During this time, A.G. and her mother came to realize that A.G. would have to attend a different high school for her own safety and well-being.

113.    Overwhelmed by trauma and CPS' failure to do anything about it, A.G. began to exhibit symptoms of anxiety and depression.

114.    Based on her experience at CPS, A.G.'s parents decided not to enroll A.G. in the school for the following year, which resulted in A.G. having to adjust to a new environment while still processing the assaults and bullying that occurred months earlier.

115.    Due to the severity of her emotional distress stemming from her encounters of sexual assault at CPS, the sexually hostile environment at CPS, and the treatment she received from administrators at CPS, A.G. was forced to undergo mental health treatment.

## CAUSES OF ACTION

### COUNT I – *Violation of 20 U.S.C. § 1681, et. seq.*
### *Title IX of the Education Amendments Act*

116.    Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

117.    During the relevant timeframe, Defendant CPS was a recipient of federal education funding within the meaning of Title IX, 20 U.S.C. § 1681(a).

118.    Defendant exercised substantial control over the students who assaulted A.G. and over the boys who harassed her.

119.    All the events giving rise to this claim occurred on CPS' grounds.

120.    A.G. faced severe discrimination based on sex when she was sexually harassed and assaulted, verbally and physically on school grounds by CPS students. The sexual assaults and harassment A.G. endured were sufficiently severe, pervasive, and objectively offensive to constitute a hostile educational environment for her at CPS.

121.    Defendant CPS was on actual notice of the assaults committed on A.G. and the hypersexual hostile environment that existed at the school during A.G.'s time there.

122.    Despite being on actual notice of the assaults on and harassment of A.G., Defendant CPS failed to take meaningful action to investigate the assault and/or to protect A.G. from retaliation on the part of faculty, staff, and fellow students regarding A.G.'s attempts to seek out a safe educational environment.

123.    Defendant CPS acted with deliberate indifference to the complaints and other notice regarding the ongoing hostile education environment, ongoing threats, bullying, and retaliation faced by A.G. after reporting that she was sexually assaulted.

124.    The hostile educational environment at CPS effectively barred A.G.'s access to educational opportunities and benefits because she was forced to leave CPS due to the continuing hostile environment at the school and due to ongoing bullying and retaliation at the school.

125.    In addition to the foregoing violations of Title IX, Defendant CPS violated its Title IX obligations by:

    a.  Failing to have a Title IX coordinator or any other person to receive complaints about gender-based discrimination, harassments, and/or assaults;

    b.  Failing to have any policy for a student's reporting of sexual harassment and/or sexual assault;

    c.  Failing to have a program for prevention of sexual harassment and sexual assault;

    d.  Failing to have a program or policy for investigating sexual harassment or sexual assault;

    e.  Failing to have a program or policy for offering accommodations to victims of sexual assault;

    f.   Failing to have a program or policy for preventing retaliation against those who report sexual harassment and/or sexual assault;

    g.   Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

    h.   Retaliating against A.G. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

126.    As a direct and proximate cause of Defendant CPS' violation of Title IX, A.G. has been deprived of educational opportunities and benefits that delayed her academic attainment during her high school education and thereafter. This deprivation was the result of Defendant's deliberate indifference to the hostile educational environment at CPS.

127.    As a direct and proximate cause of Defendant CPS' violation of Title IX, A.G. has experienced and will likely continue to experience severe emotional distress accompanied by objective physical manifestations and/or symptoms (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep), loss of functioning, loss of earning potential, medical bills, and other pecuniary harms to be established at trial.

**WHEREFORE** Plaintiffs demand compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

## COUNT II – *Negligent Supervision and Retention*

128.    Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

129.    Defendant CPS had a fiduciary relationship with A.G. as both a student and minor under the age of 18.

130.    As a Maryland educational institution, Defendant CPS owed A.G. a special duty of trust and confidence to ensure her safety and well-being.

131.    Defendant CPS, through its Board of Directors, administrators, faculty, or staff, breached its duty owed to A.G. by, among other things:

    a.   Failing to properly protect A.G., then a minor, from sexual abuse and harassment;

    b.   Improperly protecting A.G., then a minor, from sexual abuse and harassment;

    c.   Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

    d.   Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

    e.   Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of CPS facilities for sexual exploits and use of CPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

    f.   Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

    g.   Failing to promptly report A.G.'s sexual assaults to the authorities;

    h.   Failing to take any action to prevent retaliation against A.G. after her assaults were reported to CPS;

    i.   Failing to conduct an exit interview with A.G. when she left the school;

j.   Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

k.   Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

l.   Retaliating against A.G. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

132.    Defendant CPS, through its Board of Directors, administrators, faculty, or staff, knew or should have known that it had created an opportunity for A.G. to be sexually assaulted and harassed and that the lack of protocols for which incidents of sexual assault were reported were woefully insufficient.

133.    Defendant CPS failed to provide adequate training, monitoring, and supervision of its administrators, faculty, and/or staff concerning reports of sexual assault.

134.    Defendant CPS carelessly and recklessly failed to supervise its male students, even after specific complaints of sexual assault and harassment had been lodged against them by various students, including A.G.

135.    Defendant CPS failed to implement training and monitoring mechanisms by which sexual assaults such as those suffered by A.G. could have been prevented, or at the very least, appropriately reported to parents and law enforcement authorities.

136.    Defendant CPS's conduct was wanton, malicious, or oppressive in that Defendant disregarded or exhibited reckless indifference to the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

137.     As a direct and proximate cause of Defendant CPS's violation of its fiduciary duty to her, A.G. has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

138.     As a direct and proximate result of Defendant CPS's negligence, A.G. sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiffs demand compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

## COUNT III – *Negligence*

139.     Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

140.     In the winter of 2016, A.G. enrolled at CPS and was thereby deprived of the protection of her parents while on school grounds and during the school day.

141.     Upon A.G.'s enrollment, Defendant CPS assumed custody of her and other students while on the school's premises.

142.     In so doing, Defendant CPS entered into a relationship with A.G. that imposed on it a duty of reasonable care, including, among other things, a duty of supervision to protect A.G. from reasonably foreseeable harm.

143.    Defendant CPS, through its Board of Directors, administrators, faculty, or staff, breached their duty owed to A.G. by, among other things:

a.   Failing to properly protect A.G., then a minor, from sexual abuse and harassment;

b.   Failing to identify and eliminate, minimize, and/or address known and foreseeable risks of physical and emotional injury;

c.   Improperly protecting A.G., then a minor, from sexual abuse and harassment;

d.   Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

e.   Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

f.   Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of CPS facilities for sexual exploits and use of CPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

g.   Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

h.   Failing to promptly report A.G.'s sexual assaults to the authorities;

i.   Failing to take any action to prevent retaliation against A.G. after her assaults were reported to CPS;

j.   Failing to conduct an exit interview with A.G. when she left the school;

k.   Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

22

l.  Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

m.  Retaliating against A.G. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

144.  Defendant CPS, through its Board of Directors, administrators, faculty, or staff, knew or should have known that it had created an opportunity for A.G. to be sexually assaulted and harassed.

145.  Defendant CPS's conduct was wanton, malicious, or oppressive in that Defendant disregarded or exhibited reckless indifference to the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

146.  As a direct and proximate cause of Defendant CPS's violation of its fiduciary duty to her, A.G. has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

147.  As a direct and proximate result of Defendant CPS's negligence, A.G. sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiffs demand compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including

attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

**COUNT IV – *Premises Liability***

148.    Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

149.    While on CPS' premises, A.G. was a business invitee of Defendant CPS.

150.    Defendant CPS owed A.G. a duty to use reasonable care under all circumstances in the maintenance and operation of the premises, and to take reasonable precautions to protect her against foreseeable dangers arising out of the arrangements or use of the premises.

151.    Defendant CPS, through its Board of Directors, administrators, faculty, or staff, failed to act with reasonable care to protect A.G. and her fellow female students from foreseeable dangers of which CPS had ample actual notice, including, among other things:

    a.  Failing to properly protect A.G., then a minor, from sexual abuse and harassment;

    b.  Improperly protecting A.G., then a minor, from sexual abuse and harassment;

    c.  Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

    d.  Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

    e.  Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of CPS facilities for sexual exploits and use of CPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

24

f.   Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

g.   Failing to promptly report A.G.'s sexual assaults to the authorities;

h.   Failing to take any action to prevent retaliation against A.G. after her assaults were reported to CPS;

i.   Failing to conduct an exit interview with A.G. when she left the school;

j.   Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

k.   Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

l.   Retaliating against A.G. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

152.   Defendant CPS, through its Board of Directors, administrators, faculty, or staff, knew or should have known that it had created an opportunity for A.G. to be sexually assaulted and harassed.

153.   Defendant CPS's conduct was wanton, malicious, or oppressive in that Defendant CPS disregarded or exhibited reckless indifference to the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

154.   As a direct and proximate cause of Defendant CPS's violation of its fiduciary duty to her, A.G. has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate,

sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

155.    As a direct and proximate result of Defendant CPS's negligence, A.G. sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiffs demands compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

<u>**COUNT V – *Intentional Infliction of Emotional Distress***</u>

156.    Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

157.    While on CPS' premises, A.G. was a business invitee of CPS.

158.    Defendant CPS owed A.G. a duty to use reasonable care under all circumstances in the maintenance and operation of the premises, and to take reasonable precautions to protect her against foreseeable dangers arising out of the arrangements or use of the premises.

159.    Defendant CPS, through its Board of Directors, administrators, faculty, or staff, failed to act with reasonable care to protect A.G. and her fellow female students from foreseeable dangers of which CPS had ample actual notice, including, among other things:

        a.   Failing to properly protect A.G., then a minor, from sexual abuse and harassment;

        b.   Improperly protecting A.G., then a minor, from sexual abuse and harassment;

c.  Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

d.  Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

e.  Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of CPS facilities for sexual exploits and use of CPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

f.  Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

g.  Failing to promptly report A.G.'s sexual assaults to the authorities;

h.  Failing to take any action to prevent retaliation against A.G. after her assaults were reported to CPS;

i.  Failing to conduct an exit interview with A.G. when she left the school;

j.  Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

k.  Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

l.  Retaliating against A.G. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

27

160.    Defendant CPS, through its Board of Directors, administrators, faculty, or staff, knew or should have known that it had created an opportunity for A.G. to be sexually assaulted and harassed.

161.    Defendant CPS's conduct was extreme and outrageous, and it intentionally or recklessly caused A.G. severe emotional distress.

162.    Defendant CPS's conduct was so outrageous in character, and so extreme in degree, that it exceeds all possible bounds of decency, is atrocious, and is utterly intolerable in a civilized community.

163.    Defendant CPS purposefully intended to cause or recklessly disregarded the high probability of causing a disturbance of A.G.'s emotional tranquility that was so severe that harmful physical consequences resulted.

164.    As a direct and proximate cause of Defendant CPS's violation of its fiduciary duty to her, A.G. has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

165.    As a direct and proximate result of Defendant CPS's negligence, Plaintiff A.G. sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiffs demand compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including

attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

## COUNT VI – *Negligent Infliction of Emotional Distress*

166.    Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

167.    Defendant CPS had a duty to A.G. to refrain from engaging in the above-described conduct that it knew, or should have known, would foreseeably cause emotional distress to her.

168.    To the extent Defendant CPS's conduct is not found to be reckless and/or intentional, the conduct is—at the very least—negligent.

169.    Defendant CPS's negligent acts include, but are not limited to:

a.   Failing to properly protect A.G., then a minor, from sexual abuse and harassment;

b.   Improperly protecting A.G., then a minor, from sexual abuse and harassment;

c.   Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

d.   Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

e.   Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of CPS facilities for sexual exploits and use of CPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

f.  Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

g.  Failing to promptly report A.G.'s sexual assaults to the authorities;

h.  Failing to take any action to prevent retaliation against A.G. after her assaults were reported to CPS;

i.  Failing to conduct an exit interview with A.G. when she left the school;

j.  Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

k.  Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

l.  Retaliating against A.G. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

170.  As a direct and proximate cause of Defendant CPS's malfeasance and nonfeasance, A.G. has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

171.  As a direct and proximate result of Defendant CPS's negligence, Plaintiff sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiffs demand compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs demand a trial by jury on all issues in this action so triable.

Dated: March 18, 2021                    Respectfully submitted,

                                         /s/ Justin Browne_____
                                         Justin Browne (Bar No. 29164)
                                         Christina Graziano (*pro hac vice* to be filed)
                                         Brian Ketterer (*pro hac vice* to be filed)
                                         KETTERER, BROWNE & ANDERSON, LLC
                                         336 S. Main Street
                                         Suite 2A-C
                                         Bel Air, MD 21014
                                         Phone: (855) 522-5297
                                         Fax: (855) 334-5626
                                         Justin@KBAAttorneys.com
                                         Christina@KBAAttorneys.com
                                         Brian@KBAattorneys.com